706 P.2d 1363

Paul H. LANDIS and Bessie B. Landis, husband and wife, Plaintiffs-Appellants,

v.

Myron J. HODGSON, and Joyce M. Hodgson, husband and wife, and Agnes A. Preston, a widow, and Fred L. Markley and Betty Jean Markley, husband and wife, Defendants-Respondents.

No. 14575.

Court of Appeals of Idaho.

Sept. 19, 1985.

254

Lynn J. Farnworth, Moscow, for plaintiffs-appellants.

Charles W. Hosack, Coeur d'Alene, for defendants-respondents.

SWANSTROM, Judge.

Paul and Bessie Landis brought this suit to collect the balance due on a contract for the sale of a resort business, its buildings, equipment and other personal property. Myron and Joyce Hodgson, the latest purchasers and operators of the business ceased making payments on their contract to purchase when the State of Idaho, the owner of the site where the business was located, declined to renew the lease held by the operators. The operators prevailed at trial in the district court. Mr. and Mrs. Landis have appealed. The crucial issue is whether the doctrine of impossibility excused the purchasers from making subsequent payments on the hotel sales contract after the state refused to renew the lease. The district court held that the purchasers were excused. We affirm the judgment in part.

The Park Hotel, located at the edge of Lake Catcolet upon property owned by the State of Idaho in Heyburn State Park, was a long established enterprise. The business site had been leased to private individuals for a number of years. The establishment included a "floating" restaurant, cabins, a marina and other structures, none of which were owned by the State of Idaho.

Two separate written contracts are involved in this dispute. The first, which we will refer to as the Barton contract, was entered into in 1964 between the Bartons as sellers and Mr. and Mrs. Preston as buyers. The Bartons sold their interest in the contract to the Markleys in 1966 who in turn, the same year, assigned the vendors' interest to Mr. and Mrs. Landis.

The second contract was entered into in 1969 between the Prestons and the Hodgsons. In this contract the Hodgsons agreed to purchase the Park Hotel business, good will and all other assets from the Prestons. The Preston-Hodgson contract required Hodgson to assume and pay "according to its terms" the balance due on the Barton contract. As we have noted, Landis was then entitled to receive these payments. The Hodgsons were also required to make additional payments to the

Prestons and to make the annual rental payments on the state lease. At this time the state lease had a five-year term ending on December 31, 1973. With state approval the lease was assigned to the Hodgsons.

In 1973 the State of Idaho declined to renew the lease and the hotel closed. Because we are principally concerned with transactions and testimony of Mr. Landis and Mr. Hodgson, for clarity and convenience only we will usually refer to the parties in the singular as Landis and Hodgson.

Hodgson's first indication from a state official that the lease might not be renewed came in a letter dated March 30, 1973. Hodgson's attorney wrote back requesting the state give reasons for the nonrenewal. The state's reply was that Hodgson had failed to conform with a "master plan" by July 1, 1973, as required by the lease addendum, and that trailers had been allowed on the property against the state's wishes. There were additional communications with the state regarding the renewal of the lease; however, in a letter dated November 14, 1973 the state officially informed Hodgson the lease would not be renewed and he was asked to vacate the premises after December 31.

In August of 1973 Hodgson informed Landis the lease probably would not be renewed. At that time Hodgson said he would be suspending all payments under the sales agreement unless the lease was renewed. Hodgson told Landis he was still attempting to renew the lease.

The Barton escrow sales agreement contained a two-page list of personal property including structures, boats, restaurant and hotel inventory and other paraphernalia. Hodgson informed Landis and Preston that he would turn over possession of all property to them. Hodgson winterized the facilities as usual that fall. However, in January of 1974 there was an unusual flood which damaged the structures and personal property. The salvageable property was returned to the hotel site by Hodgson. At that time Hodgson sold some row boats for $600, retaining the proceeds. Otherwise, all other personal property remained at the site after he vacated the premises in March of 1974. In April the state sent Landis a letter stating all property which was not retrieved by May 6 would be considered abandoned to the state. Landis never retrieved the property.

Meanwhile, in November 1973, Mrs. Preston, then a widow, sent Hodgson a notice of forfeiture stating that "all payments [on the Preston-Hodgson contract] shall be deemed forfeited as liquidated damages" and the escrow papers would be returned to her. Landis wrote Hodgson on March 1, 1974 to "advise that unless the account is brought current right away my attorney is seeking a judgment for the balance." Hodgson failed to pay and Landis filed an action to enforce the collection of the contract on June 6, 1974. That suit was dismissed for lack of prosecution on January 5, 1976.

Landis filed the present action in August, 1978 against Preston and the Hodgsons, as well as the Markleys. In one count Landis sought to collect the balance due on the contract he held. A second, alternative count was for damages due to "waste" of the personal property involved in the sale. The Markleys moved for and were granted summary judgment. They are no longer parties to the action. The Hodgsons filed a third party complaint against the state. Both claims against Preston and the state were resolved before trial and each was dismissed with prejudice at that time. Hodgson moved for summary judgment, raising several defenses. Landis also moved for partial summary judgment on the question of liability. The district court ruled that a $1,500 contract payment due on August 10, 1973 was barred by the statute of limitation; however, other subsequent payments were not barred. The Landises' claim for waste was also retained for trial, as were other issues.

At trial the Landises' case consisted of the deposition of Mr. Landis and the exhibits which were admitted during his testimony. Mr. Hodgson, his former attorney, and a park ranger testified for the defense.

Their testimony basically concerned why the lease was not renewed by the state. Hodgson testified that he had complied with all the requirements that the state had imposed for renewal of his lease. The park ranger also testified the facilities conformed to state requirements. At no time did Landis submit any evidence showing that Hodgson did not comply with some state "master plan." The trial judge ruled that the state's termination of the lease was an unforeseeable event and not based on any fault of Hodgson; that it was impossible for Hodgson to fulfill the terms of the contract. The judge also held the Landis claim was barred by laches. He based this ruling on the fact that Landis waited five years from default to file this action and on the fact that a previous action had been dismissed without prejudice two years earlier for lack of prosecution.

Landis appeals raising five issues: Whether the district court erred in ruling: (1) that Landis had a duty to mitigate damages; (2) that the defense of impossibility allowed Hodgson to be released from the escrow agreement because the state refused to renew the lease; (3) that Hodgson had established a defense of laches; (4) that Landis was not entitled to recover on a claim for waste independent of his right to enforce the contract; and (5) that the parol evidence rule was improperly applied when the court allowed testimony as to the intent of the contracting parties when they entered into the Preston-Hodgson contract. We believe the pivotal issue is whether the district court properly applied the doctrine of impossibility.

## DEFENSE OF IMPOSSIBILITY

The Idaho Supreme Court addressed the doctrine of impossibility in *Twin Harbors Lumber Company v. Carrico*, 92 Idaho 343, 442 P.2d 753 (1968). The Court stated:

The doctrine of impossibility excusing performance of a contractual obligation, ... provides generally that if by express terms of a bargain or within the contemplation of the bargaining parties the existence of a specific thing is essentially necessary for the performance of a promise in the bargain, "a duty to perform the promise ... is discharged if the thing ... subsequently is not in existence in time for seasonable performance." [RESTATEMENT, CONTRACTS § 460 (1932).]

... A sine qua non for application of the doctrine is that the parties must have contracted, expressly or in necessary contemplation, with reference to continued existence of the specific thing as a condition essential to performance. Otherwise, the fundamental principle underlying the law of contracts will operate to bind the promisor to perform according to the terms of his agreement.

*Id.* at 348–49, 442 P.2d at 758–59 (footnotes omitted).

■ Since *Twin Harbors*, the RESTATEMENT OF CONTRACTS has been superseded by the RESTATEMENT (SECOND) OF CONTRACTS. RESTATEMENT (SECOND) OF CONTRACTS makes some change in the substantive area of impossibility. Section 261 reads:

Discharge by Supervening Impracticability. Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

■ In determining whether the non-occurrence of a particular event was a basic assumption, a court will look at all the circumstances, including the terms of the contract. The fact that the event was unforeseeable is significant in suggesting that the non-occurrence was a basic assumption. "If the superseding event was not reasonably foreseeable when the contract was made, the party claiming discharge can hardly be expected to have provided against its occurrence. However, if it was reasonably foreseeable, or even foreseen, the opposite conclusion does not necessarily follow." RESTATEMENT (SEC-

OND) OF CONTRACTS § 261, comment (c) (1981).

One such superseding event has been the government imposition of a new law, regulation or order which makes the performance of a duty impractical. RESTATEMENT (SECOND) OF CONTRACTS § 264 (1981). If such performance becomes impractical, i.e., if the order or regulation was an event the non-occurrence of which was assumed at the time the contract was made, the person will be relieved of his duty to perform. Where a contract is executed involving a lease, which requires the permission of government officers, the fact that such permission is not forthcoming when required has been held not to constitute an excuse for nonperformance. 17A C.J.S. CONTRACTS § 463(1) (1963); *Shore Investment Company v. Hotel Trinidad,* 29 So.2d 696 (Fla. 1947); *Helms v. B & L Investment Company,* 19 N.C.App. 5, 198 S.E.2d 79 (1973); *see generally,* Annot., 84 A.L.R.2d 12 (1962); W. Jaeger 18 WILLISTON ON CONTRACTS § 1939, at 51–56 (3rd ed. 1978). There are recognized exceptions to this rule as stated in *Lane v. Dashiell,* 195 Md. 677, 75 A.2d 348, 353–54 (1950):

It is a general rule of the common law that when the impossibility of performance arises after the formation of the contract, the failure of the promisor to perform is not excused. This rule was founded on the theory that if the promisor makes his promise unconditionally, he takes the risk of being held liable even though performance should become impossible by circumstances beyond his control. The unjust consequences of this general rule gave rise to certain exceptions. One of these is that a contractual duty is discharged where performance is subsequently prevented or prohibited by a judicial, executive, or administrative order, in the absence of circumstances showing either a contrary intention or contributing fault on the part of the person subject to the duty. [Citations omitted.] But an order which interferes with the performance of the contract is not an excuse if the circumstances surrounding the formation of the contract are such as to indicate that the possibility of such interference was recognized and the risk of it was assumed by the promisor.

*Lane* is cited as authority in *Acme Moving and Storage Corporation v. Bower,* 269 Md. 478, 306 A.2d 545 (1973). In *Acme,* a lease agreement was executed for a warehouse. The landlord had to obtain a special variance to build a totally enclosed warehouse. The variance was granted subject to ten conditions regarding fencing, landscaping, parking and vehicular access. The landscaping plan had to be submitted to the county planning board for approval. A plan was submitted; however, it was not approved. The board promulgated its own plan which provided for the removal of a chain-link fence and a sidewalk surrounding the buildings. Without the fence and sidewalk the warehouse did not comply with the zoning law as a totally enclosed warehouse and could not receive a use and occupancy permit which was required in the lease. The Maryland Court of Appeals held the tenant could not sue for specific performance of the lease. No fault was found on the part of the landlord in failing to obtain the use and occupancy permit. There was no suggestion that the refusal to issue the use and occupancy permit was foreseeable or that the landlord assumed the risk for such refusal. Therefore, the defense of impossibility of performance was properly available to him.

Here we have a similar situation. The district court found that Hodgson was not at fault, that he had maintained the hotel in good condition meeting the state requirements. The district court allowed Hodgson to testify about his understanding of the lease agreement with the state. He testified he thought the lease would be continued indefinitely based on the longevity of the hotel business and assurances by the superintendent of the Heyburn State Park that the state would not cancel the lease. Landis claims this evidence inadmissible under the parol evidence rule because the Preston-Hodgson sales agreement

states each individual is entering into the contract based on his own investigation and not upon representations of other people. We do not believe the clause disallows testimony by Mr. Hodgson of his understanding regarding continuation of the state's lease. Such evidence goes to the issue of foreseeability. It goes also to whether the parties mutually assumed the lease would be renewed throughout the duration of the contract to purchase. Thus, parol evidence was not adduced to alter the meaning of the written contract but to establish a defense provided by law—impossibility—to which the parties' mutual assumption of facts is relevant. The evidence clearly supports Hodgson's claim that the nonrenewal of the lease was an event which, when the contract was entered into, the parties assumed would not occur.

■ Landis argues that even if the doctrine of impossibility were to apply, Hodgson has failed to show he exhausted all administrative remedies. Landis asserts this is a condition precedent to a valid defense under the doctrine. However, Landis has not pointed to any administrative remedy available to Hodgson in this instance. The trial court found, upon substantial evidence, that Hodgson had "faithfully performed all terms and covenants of the state lease;" that Hodgson had "clearly communicated" to the state his intent and desire to enter into a new lease; that any additional "formal request" by Hodgson "for a new lease would have been a useless act." Hodgson's lease did not give the lessee any "right to renew" with or without notice. The choice of renewal lay solely with the state. The court found that "the [Park and Recreation] Board had simply decided to no longer permit any kind of concession operation at the site." *See, e.g.,* I.C. § 67–4204. That finding is not clearly erroneous. Landis has not shown any probability that an appeal from the Park and Recreation Board's decision would have produced a different result.

■ The district judge implicitly held that impossibility of performance of the two contracts did not arise until the expiration of the state's lease at the end of 1973. We agree with this holding. It therefore follows that Hodgson was not excused from making the $1,500 payments due on the Barton contract on August 10 and September 10, 1973.

Prior to trial, in a partial summary judgment order, the district court held that Landis' right to recover the August 10th payment was barred by the statute of limitations because this suit was commenced August 25, 1978, more than five years after the payment came due. I.C. § 5–216. Landis asserts this ruling was erroneous.

## STATUTE OF LIMITATIONS DEFENSE

In the district court Landis argued that the statute of limitations had been tolled while Hodgson was outside the state of Idaho in the military service. Landis relies in part upon I.C. § 5–229 which provides that the time a defendant is absent from the state is not counted against the time within which an action can be brought. The district judge held that, under Idaho's Long-Arm Statute, I.C. §§ 5–514 to –517, enacted in 1961, Landis "could have served the defendant outside the State of Idaho and proceeded with his action." The district judge therefore held that Landis showed no good reason for the long delay in filing his (second) action against Hodgson. This ruling was made in connection with the court's analysis of the laches defense asserted by Hodgson. Nevertheless, the district judge must have applied the same reasoning when he made his earlier ruling that the statute of limitations had run against the August 10, 1973 installment. In any event, for reasons next discussed, we do not need to decide whether I.C. § 5–229 has any effect upon the running of the statutorily limited period for bringing the present action on a written contract.

■ Landis also relied upon the provisions of the Soldiers' and Sailors' Civil Relief Act of 1940 (50 U.S.C.A.App. §§ 501–591) for the proposition that the

limitation period had not run on any of his claims against Hodgson. Here, the district court found that Hodgson was "outside the State of Idaho in the United States Air Force from the spring of 1974 until sometime in 1978." Section 525 of the Act provides in pertinent part as follows:

> The period of military service shall not be included in computing any period now or hereafter to be limited by any law, ... for the bringing of any action or proceeding in any court, ... by or against any person in military service ... whether such cause of action or the right or privilege to institute such action or proceeding shall have accrued prior to or during the period of such service, ....

While the district judge briefly discussed other aspects of the Act he did not discuss or mention this section. The provisions of this section apply equally to the benefit of a civilian plaintiff as well as to the benefit of a serviceman or former serviceman. In fact, the tolling of the period of limitations under this section is mandatory in state courts, as well as in federal courts. *See Ray v. Porter*, 464 F.2d 452 (6th Cir.1972). The section works to toll the running of the statutory period even when the defendant may be subject to out-of-state service because of, *e.g.*, a nonresident motorist act. *Id. See also Campbell v. Rockefeller*, 134 Conn. 585, 59 A.2d 524 (1948); *Blazejowski v. Stadnicki*, 317 Mass. 352, 58 N.E.2d 164 (1944); Annot., 36 A.L.R. Fed. 420 (1978). In summary, we are led to the conclusion that none of Landis' claims against Hodgson was barred by any statute of limitations.

Even though Hodgson had advance notice, as early as March 1973, that the State might not renew his lease, he continued to occupy the premises under the state lease until it expired December 31, 1973. At least during the months of August and September Hodgson continued to operate the business as he had done in previous years. These were the only remaining months in 1973 in which payments fell due to Landis under the Barton contract. Therefore, unless Hodgson has shown that the defense of laches applies to bar collec-

tion of these contract payments, Landis is entitled to judgment for the two payments of $1,500 each.

## LACHES DEFENSE

Laches is an equitable doctrine which bars a claim for relief if an unreasonable delay prejudices the defendant. The doctrine arose at a time when there were no statutes of limitation applicable to equity claims. Early equity courts adopted analogous legal limitations as a rough guide, which presumptively disallowed claims brought beyond the analogous legal limitation period. The theory was that such a delay in asserting one's right had harmed the other party. Conversely, if a claim was brought within the analogous limitation period, it was assumed that defendant had suffered no harm from the delay. However, even if a suit was timely filed, defendant could plead laches, which required him to show actual prejudice. *See* D. Dobbs, HANDBOOK ON THE LAW OF REMEDIES § 2.3 at 43–44 (1973).

█ Whether or not a party is guilty of laches is a question of fact determined from all the evidence and circumstances adduced at trial. *Huppert v. Wolford*, 91 Idaho 249, 420 P.2d 11 (1966). To invoke the defense of laches, Idaho requires the following elements to be proven:

> (1) defendant's invasion of plaintiff's rights, (2) delay in asserting plaintiff's rights, the plaintiff having had notice and an opportunity to institute a suit, (3) lack of knowledge by defendant that plaintiff would assert his rights, and (4) injury or prejudice to defendant in event relief is accorded to plaintiff or the suit is not held to be barred. Lapse of time, although an important element, is not alone controlling in determining the applicability of the defense of laches, unless the party claiming laches was injured or placed at a disadvantage by such delay.

*Id.* at 257, 420 P.2d at 19.

The district court held that each of the four elements had been proven (1) when

Hodgson discontinued payments in August and September 1973 and notified Landis to take possession of the personal property there was an invasion of Landis' rights. (2) The court found that the delay from August 1973 to August 1978 in pursuing the action was a "considerable delay" by Landis in asserting his rights. (3) The court further found that when Landis filed his first action in 1974 and then permitted it to be dismissed in January 1976 for lack of prosecution, Hodgson "was entitled to assume that [Landis] no longer intended to assert any of his rights for enforcement of the contract." (4) Finally, the court found that the long delay had brought about a loss of records, memory and evidence that prejudiced the presentation of Hodgson's defense.

 As to Landis' claims for the payments due under the contract, specifically the payments due in August and September 1973, we do not believe Hodgson has shown that he had any defense to such payments that has been prejudiced by the delay. As we have indicated, Hodgson's defense of impossibility of performance did not reach these two payments because they fell due before the event occurred that rendered performance impossible. There was no question or dispute as to the amount of the payments, when they were due, or whether they had been paid. Records from the bank that had acted as escrow holder of the Barton-Preston contract were introduced—without objection—to show what payments had been made on the contract. Hodgson readily admitted he had not made the two payments. The reason he gave for not making the payments was also clear. By Hodgson's own testimony he did not make the payments because by August 1973 he had been informed by the state that the lease would probably not be renewed. There was no assertion by Hodgson or any evidence at trial indicating the imminent termination of the lease in any way hindered Hodgson's ability to perform the contact or enjoy the benefits of

the state lease as he had done in each of the previous years. Therefore, we conclude that neither the defense of laches nor the defense of impossibility of performance should bar recovery by Landis of the August and September contract payments.

## WASTE

We turn now to issues relating to Landis' claim for "waste." The district court dismissed this claim. The court first noted that a seller who sues for specific performance of a contract has no right to recover both the balance due on the contract and damages for destruction or loss of the very assets which are being sold. *Christensen v. Christensen*, 100 Idaho 733, 605 P.2d 80 (1979). The district court did *not* hold, and neither do we, that where, as here, a seller sues in the *alternative* for specific performance or for damages due to loss of assets in possession of a contract purchaser, the ruling in *Christensen* prevents recovery of damages. The case should not be read so broadly.

The district court went on to hold that "the right to recover for waste would be dependent upon the right to enforce the contract." This statement which may, on its face, appear to be erroneous must be viewed in light of the particular facts and the district judge's explanation.

Here, it was undisputed that in September 1973 when Hodgson advised Landis he would make no further payments on the contract unless the state lease was renewed, Hodgson notified Landis that he could come and take possession of the property. It is undisputed that in the fall of 1973 Hodgson took steps to protect and winterize the property. It is clear that even after the lease expired and Landis was requested to take possession of the personal property or authorize its liquidation Landis did neither. In January 1974 some of the assets were lost or damaged due to unusual flooding. Finally, in the spring of 1974 the state took possession of the leased premises. Landis never at-

tempted to reclaim any of the assets that were then on the premises. The court held that the loss of the property was not the fault of Hodgson as he did attempt to preserve the property.

Landis asserts the district court erred in ruling that he had some duty to preserve or liquidate the assets. If Landis' only claim was for collection of the balance due on the contract, he might be correct. However, Landis was suing alternatively for waste. The district judge reasoned that without the fault of either Landis or Hodgson the lease was terminated rendering further performance of the contract impossible. When that event occurred, "Hodgson had no further liability or responsibility to perform the contract except to preserve and protect the security for [Landis] for a reasonable period of time to give the creditor opportunity to liquidate the same, or, within a reasonable time and in a commercially reasonable manner do so himself." The court found that Hodgson did preserve the security but that Landis took no action within a reasonable time to either possess the security or to authorize its liquidation. Therefore, Landis did not show that Hodgson was responsible for losses incurred in respect to the personal property. We conclude that the district judge did not err in dismissing the claim for waste.

In summary, we uphold the district court's ruling that Hodgson is not liable for contract payments coming due after December 31, 1973, and the ruling dismissing the claim for waste. We vacate and remand for entry of a judgment in Landis' favor for the contract installments due August and September 1973 together with prejudgment interest thereon. We hold that neither party to this appeal has wholly prevailed and therefore the parties will bear their own costs and attorney fees.

WALTERS, C.J., and BURNETT, J., concur.